IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL BRUNO, et al.,              :
                                    :
        Plaintiffs                  :
                                    :
    v.                              :        CIVIL NO. 3:09-CV-00874
                                    :
BOZZUTO'S, INC.                     :        (Judge Brann)
                                    :
        Defendant                   :

## MEMORANDUM
April 23, 2015

Currently pending before the Court is the Defendant's motion for sanctions due to spoliation of evidence and motion seeking to exclude the expert opinions and testimony of Plaintiffs' witnesses.  Briefing has concluded and these motions are now ripe for disposition.  For the reasons set forth below, Defendant's motion for spoliation sanctions is granted in part and denied in part.  Defendant's motion to exclude expert witnesses James N. Dragotto and Murli Rajan will be denied without prejudice and with leave to renew its objections at a later date in accordance with this Memorandum.  Defendant's motion to exclude the expert report of Lisa Bruno, CPA, will be granted.

## I.    Background

On May 7, 2009, Plaintiffs Michael Bruno ("Mr. Bruno"), Lisa Bruno, CPA ("Ms. Bruno"), Bruno's Market, Inc. ("Bruno's Market"), and Bruno's Market II,

Inc. (collectively "Bruno's") filed a Complaint against Defendant Bozzuto's, Inc. ("Bozzuto's") alleging, *inter alia*, breach of contract, negligence, negligent misrepresentation, and fraudulent misrepresentation.  (ECF No. 1).  This Complaint was twice amended.  (ECF Nos. 8, 63).  Bruno's alleges that in May 2007, Bozzuto's breached an oral contract to pay a debt of approximately $380,000 that Bruno's owed to its then supplier Associated Wholesalers, Inc. ("AWI"), and that Bozutto's thereafter failed to supply groceries to Bruno's Market.  (ECF No. 63).

As part of the process in providing groceries to Bruno's Market, Bozzuto's removed all AWI equipment from Bruno's Market and re-tagged all inventory using Bozzuto's barcodes.  Id. at ¶ 25.  At some point thereafter, AWI learned of these facts and threatened to sue Bozzuto's for tortious interference with contract. Id. at ¶ 26.  Bruno's alleges that Bozzuto's then abandoned its contract with Bruno's, leaving them with equipment that was not capable of ordering inventory from AWI and was incapable of scanning any AWI bar-coded inventory.  Id. at ¶ 28.  Bruno's Market was forced to close down shortly thereafter, and Bruno's began considering litigation against Bozzuto's no later than May 31, 2007.  (ECF No. 202, Ex. H, at 9).

Mr. and Ms. Bruno moved to California in August or September of 2008. Id. at ¶ 31; ECF No. 94, Ex. D, at 53.  Before moving, the two threw away every

paper record they possessed for Bruno's Market, including general ledgers, invoices, sales reports, cancelled checks, company bills, time clock reports, trial balances, balance sheets, income statements.  Id. at 42:24-46:23; 52:19-55:12.  Ms. Bruno explained that "it was very difficult for us to retain records, and at the time storage was way too high, so we threw the records out[.]"  Id. at 52:25-53:3.  The only computer that Bruno's Market's utilized was also "thrown out" by Ms. and Mr. Bruno.  Id. at 54:3-10.  Bruno's did not maintain any copies of the computer's software or any of the information contained within the computer.  Id. at 54:11-16.

As part of discovery, on October 27, 2009, Bozzuto's requested any and all documents relating to the financial operations of Bruno's Market through 2008. (ECF No. 202, Ex. D).  This request included documents such as balance sheets, profit and loss statements, and all tax returns.  Id.  On June 10, 2010 Bozzuto's sent a follow-up letter to Bruno's counsel, requesting "all financial record, trial balances, profit and loss statements, balance sheets, records of sales, cash disbursements, expenses, payroll and depreciation and all those documents related to the financial records [of Bruno's Market] from January 1, 2004 to present."  Id. at Ex. E.  In a reply letter dated June 15, 2010, counsel for Bruno's notified Bozzuto's that "none of the documents requested in [the] letter exist."  Id. at Ex. F.

On March 24, 2011, Joseph Patterson, Bruno Market's accountant, confirmed that he maintained Bruno's Market's past federal and state tax returns.

Id. at Ex. G, 9:20-10:11; 91:7-14; 99:11-16.  He further testified that all other financial records were maintained by Bruno's.  Id.  Mr. Patterson stated that Bruno's Market created sales and expense reports, which were then entered into a computer program known as "DacEasy."  Id. at 91:7-95:22.  This program would then generate income statements and trial balances.  Id.

On March 28, 2011, Ms. Bruno was deposed.  Id. at Ex. H.  Ms. Bruno noted that, as a CPA, she was aware that companies generally needed to maintain their financial records for at least three years from either "the date of the [tax] filing or the due date."  Id. at 79:3-9.  These documents should include general ledgers, bank statements, cancelled check, "and so on."  Id. at 79:16-21.

On June 3, 2011, James Dragotto and Murli Rajan filed an expert report (the "First Dragotto-Rajan Report") on behalf of Bruno's calculating the future losses incurred as a result of Bozzuto's alleged breach of contract.  Id. at Ex. I.  This report calculated total damages between $2,224,565 and $2,579,939.  Id. at 7.  The First Dragotto-Rajan Report purportedly relied on numerous documents in reaching this conclusion, including past tax returns.  Id. at 2.  However, Mr. Dragotto later clarified that he and Mr. Rajan had relied almost exclusively upon a *pro forma* analysis performed by Bozzuto's showing that Bruno's would have projected future sales of $150,000 per week.  Id. at Ex. DD, 72:17-76:1.  Mr.

Dragotto did not analyze or review the calculations in any way; he relied upon the *pro forma* analysis "100 percent." Id. at 85:1-11.

In response, Bozzuto's submitted two expert reports, one by John Slavek, CPA (the "First Slavek Report") and one by David Duffus, CPA (the "First Duffus Report"). (Doc. 202, Ex. K, M). Mr. Slavek opined that, due to missing financial data, he could not "reach a conclusion within a reasonable degree of certainty concerning": (1) the profitability of Bruno's Market between April 1, 2006 and May 1, 2007; (2) the accuracy of the numbers used in the First Dragotto-Rajan Report; and (3) the financial condition of Bruno's Market between April 1, 2004 and May 31, 2007. Id. at Ex. K. However, the First Slavek Report did opine that the First Dragotto-Rajan Report was deeply flawed and inherently unreliable. Id. The First Duffus Report concurred with the First Slavek Report, and similarly concluded that the missing financial records prevented the completion of "a report which properly assesses Bruno's Market's financial condition and its alleged damages." Id. at Ex. M.

In October 2011, Bozzuto's filed a motion for sanctions based on spoliation of evidence related to the financial records destroyed by Mr. and Ms. Bruno. (ECF No. 94). Bozutto's argued that it was unable to assert three primary defenses as a result of the spoliation: (1) Bruno's Market's own poor financial condition was the sole cause of any harm suffered; (2) Bruno's Market was not profitable between

April 1, 2006 and March 31, 2007; and (3) Bruno's expert report was inaccurate (collectively the "Three Defenses"). Id. Although the Court ultimately determined that spoliation of evidence occurred, (doc. 127, pp. 11-12), Bruno's asserted that the evidence was available electronically through the computer system owned by AWI. Id. at 10. Therefore, Bruno's was directed to obtain all of the requested data from AWI and turn the information over to Bozzuto's. Id. at 12. The Court concluded that "[i]f the requested data are no longer in AWI's possession, the Court will reconsider its ruling." Id.

Thereafter, Bruno's subpoenaed AWI seeking the relevant data, but AWI responded that it did not possess that data. Id. at Ex. O). AWI asserted that, contrary to Bruno's assertions, financial data was "maintained only at the retail store's location and is not, at any point, pulled back to AWI." Id. AWI did however produce weekly sales information for Bruno's Market from April 1, 2003 to May 12, 2007. Id. This sales information was obtained from a marketing program that extracted the information directly from Bruno's Market's point of sale machines. Id.

On June 19, 2013, Bruno's attorney forwarded 516 pages of information obtained from FMS Solutions ("FMS") to Bozzuto's attorney. (ECF No. 150, Ex. R(1)-(6)). This contained portions of Bruno's Market's general ledger from July 8, 2006 through May 12, 2007, including most of the relevant financial data for that

period of time.  Id.  This was the only information that FMS possessed regarding Bruno's Market.  (ECF No. 176).

On August 23, 2012, Ms. Bruno submitted an affidavit attesting that, based on the general ledger information, Bruno's Market sales for the 2007 fiscal year totaled $6,211,555.49.  (ECF No. 202, Ex. T).  Based on the information provided by FMS, Bruno's submitted recreated profit and loss statements and balance sheets for the period from July 2006 to March 2007, as well as the period from April 2007 to May 2007.  Id. at Ex. W, X.  These records demonstrated that Bruno's Market was losing money during its final year of operation.  Id.

On June 23, 2014, Mr. Dragotto and Mr. Rajan submitted a revised expert report (the "Second Dragotto-Rajan Report").  (Doc. 202, Ex. Z).  The Second Dragotto-Rajan report adjusted the value of Bruno's Market's debt and, as a result, reduced the alleged damages downward to between $2,130,129 and $2,485,503. Id. at 1.  This report did not address any of the new financial information, but did address some of the concerns raised by Mr. Slavek and Mr. Duffus.  Id. at 8-10.

In response, Mr. Slavek submitted a revised expert report on August 8, 2014 (the "Revised Slavek Report").  Id. at Ex. AA.  The report concluded that "Bruno's Market was under increasing financial distress, especially during the period from April 2006 through mid-May 2007" and "was not operating profitably during this time and may well have had to close its store based solely on its poor financial

condition." Id. at 18.  The Revised Slavek Report again emphasized that, due to missing financial information predating April 2006, it could not "reach any opinion as to the accuracy of the figures in the [Second] Dragotto and Rajan Report to a reasonable degree of certainty[.]" Id. at 19.

A revised report was also created by Mr. Duffus on August 8, 2014 ("Revised Duffus Report"). Id. at Ex. BB.  The Revised Duffus Report concluded that "[a]s of May 16, 2007, Bruno's Market has a negative equity value of between $594,000 and $710,400" which resulted in "no loss of equity value due to the allegations made against Bozzuto's[.]" Id. at 8.  The report noted declining sales figures for Bruno's Market, and projected "cash flow deficits ranging between approximately $48,000 and $184,000" each year in the future.  Id. at 18.  Mr. Duffus opined that the Second Dragotto-Rajan was "speculative and unreliable[,]" and noted that "nothing ha[d] been done to correct the flaws and deficiencies that existed in the [First] Dragotto-Rajan Report[.]" Id. at 24.  The Revised Duffus Report reiterated that the "deficiencies in the [financial] information produced continue to preclude [the] ability to fully evaluate the purported damages presented in the [Second] Dragotto-Rajan Report." Id. at 34.  Mr. Duffus based this assertion primarily upon the belief that Mr. Dragotto and Mr. Rajan relied on Bruno's Market's restated tax returns from the 2004, 2005, and 2006 fiscal years.  Id.

Finally, Ms. Bruno submitted an expert report on October 31, 2014. Id. at Ex. CC. This report reiterated many factual issues already contained within the record, and responded to several assertions made in the Revised Slavek Report. Id.

On January 16, 2015, Bozutto's filed this "Renewed Spoliation Motion for Sanctions and "Motion to Preclude Expert Reports and Testimony" along with an accompanying legal memorandum. (ECF Nos. 202, 203). Bozutto's argues that, even with the newly acquired information, it cannot assert its Three Defenses. (ECF No. 203 at 9-11). Specifically, Bozutto's contends that its experts cannot offer opinions as to whether Bruno's Market was profitable during its final year of operation, whether Bruno's Market's own poor financial condition caused its closing, and the experts cannot adequately refute the numbers used in the Dragotto-Rajan Reports. Id. at 8-9. Bozutto's asks this Court to sanction Bruno's by dismissing the action and awarding fees to Bozutto's. Id. at 12, 14. Alternatively, Bozutto's asks this Court to preclude the reports and testimony of Mr. Dragotto and Mr. Rajan at trial. Id. at 16.

Bruno's responds that: (1) no spoliation occurred and (2) monetary sanctions should not be imposed "because [Bozutto's] has made spoliation its primary defense." (ECF No. 204 at 4). Bruno's dedicated a single paragraph of its twenty-four page reply brief toward arguing that its expert reports should not be disallowed, asserting in conclusory fashion that "[t]he qualifications of Lisa Bruno,

CPA; James Dragotto, J.D., MBA; and Murli Rajan, Ph.D., CFA, are demonstrated in their Curricula Vitaé." Id. at 20.

## II.   Discussion

### A. Defendant's Spoliation Motion

Spoliation generally occurs where a party fails to produce, destroys, or alters relevant evidence.  See, Bull v. United Parcel Serv., Inc., 775 F.3d 68, 73 (3d Cir. 2012) (citing Micron Tech., Inc. v. Rambus Inc., 645 F.3d 1311, 1320 (Fed. Cir. 2011); Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 334 (3d Cir. 1995)). To establish that spoliation of evidence has occurred, a party must demonstrate that: "[1] the evidence was in the [opposing] party's control; [2] the evidence is relevant to the claims or defenses in the case; [3] there has been actual suppression or withholding of evidence; and, [4] the duty to preserve the evidence was reasonably foreseeable to the party." Id. (citing Brewer, 72 F.3d at 334).

This Court need not belabor the point that Bruno's is clearly responsible for spoliation of evidence in this case.  It was previously noted that after Bruno's "duty to preserve evidence was triggered . . . all paper copies of invoices, balance sheets, income statements, and trial balances" within Bruno's possession were intentionally and deliberately destroyed.  (ECF No. 127 at 9).  Thus, Bruno's did destroy evidence, and the only remaining question is whether and what form of sanction is appropriate.

When a court has determined that spoliation has occurred, it must decide what sanction, if any, is appropriate to redress the destruction of evidence.  In doing so, a district court must consider "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994).  Courts should "select the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." Id. (quoting Jamie S. Gorelick, Steven Marzen, and Lawrence Solum, Destruction of Evidence, § 3.16, at 117 (1989)). Finally, courts must bear in mind that "a finding of bad faith is pivotal to a spoliation determination."[1] Bull, 775 F.3d at 79.

    i.    *Degree of Fault*

---

[1] The Third Circuit appears to use the terms "intentional" and "bad faith" interchangeably. See Bull, 665 F.3d at 79. For example, the Third Circuit stated that "a finding of bad faith is pivotal to a spoliation determination." Id. However, the Court later iterated that "we must be convinced that the District Court, on sufficient evidence, found that Bull intended to actually withhold the original documents from UPS before we can conclude that sanctionable spoliation occurred." Id. (emphasis added). This Court believes that, based on a thorough reading of the Bull opinion, the Third Circuit has determined that intentional destruction of evidence without adequate justification is sufficient to trigger spoliation sanctions.  Nonetheless, because this Court concludes that bad faith was present in this instance, spoliation sanctions are warranted regardless of the defendant's threshold burden.

Under the first consideration, Bruno's bears considerable fault for the destruction of evidence in this case.  There is no doubt that relevant evidence, including all financial records for Bruno's Market, was intentionally destroyed by Ms. and Mr. Bruno.  (ECF No. 94, Ex. D, at 53).  Mr. and Ms. Bruno threw away every paper record they possessed for Bruno's Market, including general ledgers, invoices, sales reports, cancelled checks, company bills, time clock reports, trial balances, balance sheets, income statements.  Id. at 42:24-46:23; 52:19-55:12.  Mr. and Ms. Bruno threw out these relevant files because "it was very difficult for us to retain records, and at the time storage was way too high[.]"  Id. at 52:25-53:3. Inexplicably, they also threw away the computer for Bruno's Market, and failed to maintain any copies of the electronic data contained on that computer.  Id. at 54:3-16.  The fault in disposing of this evidence is significant because such information could easily have been stored on a small flash drive or external hard drive.

The degree of fault is further amplified by Ms. Bruno's area of expertise. Ms. Bruno is a Certified Public Accountant and, in her professional capacity, she was aware that companies should maintain relevant financial records for at least three years from either "the date of the [tax] filing or the due date."  (ECF No. 202, Ex. H at 79:3-9).  These documents should include general ledgers, bank statements, cancelled check, "and so on."  Id. at 79:16-21.  It strains credulity that a professional accountant would throw away every financial record that a company

possesses simply because storage space is expensive or difficult to locate, particularly when she also disposed of the corresponding electronic data.

Incredibly, while contemplating litigation that would directly implicate Bruno's Market's financial data and with full knowledge that such information should be maintained even in the absence of imminent litigation, Ms. and Mr. Bruno made a conscious decision to destroy all relevant data to this litigation. The actions of the Plaintiffs can be described as nothing less than intentional, irresponsible, and destructive to the truth-seeking process that accompanies litigation.

The reason offered by Bruno's for destroying the evidence does not justify the actions undertaken. The actions undertaken by Mr. and Ms. Bruno are suggestive of bad faith, particularly in light of the fact that the evidence submitted by FMS shows that Bruno's Market was not profitable during its final year of operation, and that sales had been declining for some time. In short, the Court attributes bad faith to the destruction of evidence in this case. Consequently, the strong degree of fault militates toward granting equally strong sanctions.

ii.    *Degree of Prejudice*

Regarding the second consideration, while Bozutto's could once have claimed a significant degree of harm resulting from Bruno's spoliation, the evidence turned over by AWI and FMS has mitigated much of the harm that Mr.

and Ms. Bruno created.  Although Bozutto's argues that, because much of the

financial data for Bruno's Market remains missing it remains unable to assert the

Three Defenses, the Revised Slavek and Duffus Reports belie this contention.

The Revised Slavek Report reached three important conclusions based on

the financial documents obtained during discovery.  First, the report opined that

"Bruno's Market was not profitable in the fiscal year 2006."  (ECF No. 202, Ex.

AA at 10).  Second, the report concluded that "Bruno's Market . . . might well have

had to close its store based solely on its poor financial condition."  Id. at 18.  Third,

the Revised Slavek Report noted it was impossible to "perform a comprehensive

profitability analysis for Bruno's Market for the time period between April 1, 2004

and May 31, 2007 because the vast majority of the Bruno's Market accounting

records for this time period are still missing."  Id.

Similarly, the Revised Duffus Report reached four critical conclusions.

First, the report opined that as of May 16, 2007, Bruno's Market had a negative

equity value and therefore there was "no loss of equity value due to the allegations

made against Bozzuto's[.]"  Id. at Ex. BB, p. 8.  Second, the report concluded that

numerous flaws and mischaracterizations in the Revised Dragotto-Rajan Report

resulted in a "speculative and unreliable" opinion.  Id.  Third, Mr. Duffus opined

that the available financial records "do not provide a sufficient basis on which to

render an opinion regarding [the] financial condition [of Bruno's Market] over the

entire April 2004 through May 2007 time period." Id. at 33.  Fourth, Mr. Duffus

concurred with the Revised Salvek Report, and opined that "Bruno's Market was

experiencing increasing financial distress prior to May 2007[.]" Id.

Based on these expert reports, it is clear that Bozzuto's is now able to offer

evidence and opinions as to the Three Defenses.  Both of Bozzuto's expert reports

assert that Bruno's Market was not profitable during its final year of operation, and

both reports assert that Bruno's Market was under increasing financial distress.

Both expert reports assert that the two Dragotto-Rajan Reports are fatally flawed

and cannot be relied upon.  Finally, the Revised Slavek Report opines that Bruno's

Market's own financial condition may have led to the store closing even absent

Bozutto's alleged breach of contract.

While both of Bozutto's expert reports assert that they cannot properly refute

the numbers used in the Dragotto-Rajan Reports, and therefore cannot adequately

refute the Reports' conclusions, that assertion appears to be based on a misreading

of the Dragotto-Rajan Reports.  Admittedly, Mr. Dragotto and Mr. Rajan assert

that they relied upon, *inter alia*, Bruno's Market's tax returns for the 2004, 2005,

and 2006 fiscal years.  (ECF No. 202, Ex. Z at 2).  However, this reference to such

documents appears perfunctory.  As Mr. Dragotto later admitted, they had relied

almost exclusively upon the *pro forma* analysis showing projected weekly sales of

$150,000.  Id. at Ex. DD, 72:17-76:1; 85:1-11.  The admitted reliance on the *pro*

*forma* calculations may diminish the weight and credibility of the Dragotto-Rajan reports, but it also allows Bozutto's to evaluate and analyze the underlying basis of the numbers used.  Thus, all Three Defenses are capable of assertion at trial.

Although Bozutto's may assert its Three Defenses, this does not mean that no prejudice has been done by Bruno's spoliation.  Both the Revised Slavek Report and the Revised Duffus Report assert that, as a result of the missing information, they are unable to fully analyze the financial condition of Bruno's Market prior to June 2006.  This certainly hampers Bozutto's ability to put forth the best defense possible although, as discussed previously, the inclusion of Bruno's Market's financial data from June 2006 through May 2007 mitigated a great deal of this harm.  Therefore, the relatively minor degree of harm weighs against granting the severe sanctions requested by Bozutto's.

### iii.   *Least Restrictive Sanction Available*

Sanctions for spoliation of evidence include a grant of summary judgment in favor of the prejudiced party, the dismissal of a claim or claims, suppression of evidence, an adverse inference, fines, the award of attorneys' fees and costs, or a combination of these sanctions.  Mosaid Tech. Inc. v. Samsung Elec. Co., Ltd., 348 F.Supp.2d 332, 335 (D.N.J. 2004).

In this instance, the dismissal requested by Bozutto's is extreme and disproportionate to the harm done by the spoliation.  As noted previously, because

some information was obtained by third parties, Bozutto's is now able to assert its primary defenses.  Therefore, dismissal of the case, or discrete claims, is inappropriate.  Furthermore, suppression of evidence is not appropriate.  The only evidence that could realistically be stricken from the record at this point in time is Bruno's expert testimony and reports.  Given that Bozutto's experts have been able assert opinions discrediting the Dragotto-Rajan Reports and may now further attack the veracity of the number relied upon by the Dragotto-Rajan Reports, striking those reports and testimony from the record goes beyond what is necessary for remedial purposes.

The only true damage that has been done to Bozutto's is the inability to analyze the relevant financial data for Bruno's Market prior to June 2006.  This hinders Bozutto's ability to argue that Bruno's Market had been unprofitable for some time, and to assert with greater certainty that Bruno's Market's finances and customer base were potentially dwindling during this time period.  The harm done by the spoliation can therefore be best alleviated through the imposition of an adverse inference.  This would allow the jury to conclude what Bozutto's can no longer assert – that the missing financial records would have been harmful to Bruno's case, and would have shown declining profits and increasing financial difficulties.  Consequently, if this matter proceeds to trial, the jury will be instructed that it may infer that Mr. and Ms. Bruno destroyed Bruno's Market's

financial records "out of the well-founded fear that the contents would harm

[them]." Brewer, 72 F.3d at 334 (citing Gumbs v. Int'l Harvester, Inc., 718 F.2d

88, 96 (3d Cir.1983); United States v. Cherkasky Meat Co., 259 F.2d 89 (3d

Cir.1958)).

Although Bozutto's has requested that the Court award costs and expenses

associated with Bruno's spoliation of evidence, a ruling on this matter will be held

in abeyance.  Given the tortured history of discovery in this matter, which includes

more than one dozen discovery deadlines, a motion to reopen discovery, and

several court orders compelling parties to obtain, turn over, or recreate documents,

it is far from certain that discovery has reached a point of closure.

Therefore, although it appears that Bozutto's is entitled to some

compensation for costs associated with the complex and unwieldy discovery

process that has unfolded thus far, it is prudent to withhold any ruling on monetary

sanctions until such time as the Court is certain that additional discovery, and

accompanying expenses, is no longer required.  Bozutto's request for monetary

sanctions will therefore be denied with leave to refile at such a time as no further

expenses directly attributable to Bruno's spoliation are likely to arise.[2]

## B. Motion to Dismiss Bruno's Expert Witnesses

---

[2] If or when Bozutto's decides to refile such a Motion, it should detail the exact expenses and
fees incurred, with sufficient detail that the Court is capable of determining whether such
expenses, costs, or fees are duplicitous, excessive, or otherwise unnecessary.

The admissibility of expert evidence is governed by Federal Rule of Evidence 702, which allows a witness who is qualified as an expert to give testimony that would otherwise be inadmissible.  Fed. R. Evid. 702.  The Third Circuit has held that Rule 702 "embodies a trilogy of restrictions on expert testimony: qualifications, reliability and fit."  Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).

In such circumstance, the district court acts as gatekeeper, preventing opinion testimony that does not meet these requirements.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 (1993) ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue").  However, Rule 702 is not an exclusionary rule; rather, it is "meant to instruct the district courts in the sound exercise of their discretion in making admissibility determinations."  Holbrok v. Lykes Bros. S.S. Co., Inc., 80 F.3d 777, 782 (3d Cir. 1996).

1. *Dragotto-Rajan Expert Reports and Testimony*

a. Qualification

First, the qualification requirement mandates that a witness proffered to testify as an expert have specialized knowledge, skills, or training.  In re Paoli R.R.

<u>Yard PCB Litigation</u>, 35 F.3d 717, 741 (3d Cir. 1994).  The Third Circuit has "eschewed imposing overly rigorous requirements of expertise" and allows the expert testimony of witnesses who have specialized knowledge or training even in the absence of formal qualifications.  <u>Id.</u>

Bozutto's argues that neither Mr. Dragotto nor Mr. Rajan are qualified as experts because neither has "any experience or expertise in this grocery business." (ECF No. 203, p. 19).  While neither expert has experience in the grocery business, both expert have extensive experience in business valuations, rendering both experts qualified to present expert testimony in these matters.

Mr. Dragotto received a bachelor's degree in accounting and an M.B.A. focusing on economics and finance.  (ECF No. 202, Ex. I, Att. 1).  He has drafted expert reports in interruption of businesses, business valuations, and forensic accounting.  <u>Id.</u>  Mr. Dragotto has also testified previously in business valuation cases.  <u>Id.</u> at Ex. DD, 43:13-46:7.  Mr. Rajan has obtained both an M.B.A. and a Ph.D. in finance.  <u>Id.</u> at Ex. I, Att. 2.  He is a tenured professor of finance with the University of Scranton, and has provided expert reports on economic damages and valuation in numerous areas, including business valuations.  <u>Id.</u>  The Court is satisfied that Bruno's experts have sufficient expertise in field of business valuations to satisfy the "qualifications" prong.

     b.  <u>Reliability</u>

Reliability means that the testimony "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief . . . [any] inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Paoli, 35 F.3d at 742 (quoting Daubert, 509 U.S. at 590). Several nonexclusive factors may be taken into account in determining reliability: (1) the testability of the expert's hypothesis; (2) whether the methodology has been subjected to peer review and publication; (3) the frequency by which the methodology leads to erroneous results; and (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the methodology has been generally accepted in the scientific community. Daubert, 509 U.S. at 593-94.

The Third Circuit has also elaborated that courts should, if appropriate, also consider: (1) the degree to which the expert testifying is qualified; (2) the relationship of a technique to more established modes of scientific analysis; and (3) the non-judicial uses to which the scientific technique has been put. United States v. Downing, 753 F.2d 1224, 1238-39 (3d Cir. 1985).

This rule does not require that plaintiffs "prove their case twice – they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a

21

preponderance of the evidence that their opinions are reliable." Paoli, 35 F.3d at 744 (emphasis in original).  As the Third Circuit noted, "[a] judge will often think that an expert has good grounds to hold the opinion that he or she does even though the judge thinks that the opinion is incorrect." Id.

Bozutto's argues that the *pro forma* numbers relied upon by the Dragotto-Rajan Reports are sufficiently unreliable to render the Reports themselves unreliable; therefore, the Dragotto-Rajan Reports should be precluded.  (ECF No. 203 at 20).  In that vein, Bozutto's argues that: (1) there is no finding in the Dragotto-Rajan Reports that Bozutto's prepared the *pro forma* analysis; (2) the *pro forma* contained calculation errors; (3) the *pro forma* was not a sales and profit projection; (4) the $150,000 sales per week number was not viable; (5) the Dragotto-Rajan Reports are inherently unreliable based on their reliance on unverified numbers; and (6) the yearly sales figure created by extrapolating from the $150,000 weekly sales number was unreliable.  Id. at 20-25.

As an initial matter, the Court is left to determine the accuracy of Bozutto's claims without the benefit of any analysis or argument whatsoever from Bruno's attorney.  In responding to the approximately eleven pages of argument offered by Bozutto's, Bruno's attorney submitted a meager reply, one paragraph in length, consisting of a solitary and conclusory statement that was devoid of any analysis or

discussion.  Nonetheless, in analyzing the reports, it is apparent that the expert reports and testimony should not be disallowed at this point in time.

While Bozutto's details significant issues with the Dragotto-Rajan Reports, primarily related to the reliability of the numbers relied upon in reaching conclusions, these issues generally go towards the weight of the expert testimony rather than its admissibility.  See, e.g., Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc., 546 F. Supp. 2d 155, 169 (D.N.J. 2008) (citing Kannankeril v. Terminix Intern., Inc., 128 F.3d 802, 809 (3d Cir. 1997)) ("Whether [Plaintiff's expert witness] should have more diligently researched the underlying facts given to him by Plaintiff, in the Court's view, is a question of weight, not admissibility"); Burke v. TransAm Trucking, Inc., 617 F. Supp. 2d 327, 335 (M.D. Pa. 2009) (citing McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 801 (6th Cir. 2000)) ("Mere weakness in the factual basis of an opinion bears on the weight of the evidence, not its admissibility"); Montgomery v. Mitsubishi Motors Corp., No. CIV.A. 04-3234, 2006 WL 1310657, at *7 (E.D. Pa. May 12, 2006) ("because the accuracy of the data utilized [by the expert witness] is a matter that the jury, as fact finder in this case, is capable of considering, there is no basis to exclude [the expert witness'] report or testimony on grounds that the information is not reliable").

It is certainly possible that the underlying data used by the Dragotto-Rajan Reports is so inaccurate that, pursuant to FRE 703, the Court cannot rely upon the

report.  However, it is premature for the Court to determine this issue at this point in time.  While such issues would be a proper basis for excluding the expert reports, <u>Montgomery Cnty v. Microvote Corp.</u>, 320 F.3d 440, 448 (3d Cir. 2003), significant factual disputes remain regarding the accuracy of the *pro forma* analysis numbers.  As such, the Court will deny Bozutto's motion to exclude the expert testimony and reports proffered by Bruno's expert witnesses, with leave to renew its motion on this basis pending a more developed record on the issue.[3]

### 2. *Ms. Bruno's Expert Report*

Finally, the Court concludes that Ms. Bruno's expert report must be precluded based upon her lack of qualifications.  While Ms. Bruno is a CPA, her résumé makes clear that she has minimal experience in the field of business valuations.  <u>See</u>, (ECF No. 202, Ex. CC, Att. 1).  She has no experience in analyzing expert reports to determine their accuracy, no experience in determining the accuracy of future loss projections, and no experience in conducting profitability analyses.  <u>Id.</u>  It may well be that Ms. Bruno's qualifications extend beyond those listed in her résumé, but Bruno's decision not to address this issue

---

[3] The third prong of the inquiry, fit, necessitates that "the expert's testimony must assist the trier of fact." <u>Paoli</u>, 35 F.3d at 742-43.  Bozutto's sole argument against fit is that the Dragotto-Rajan Reports are not reliable, and therefore will not assist the jury.  (ECF No. 203, p. 25).  As discussed previously, the record is insufficiently developed to conclude that the Dragotto-Rajan Reports are unreliable and therefore, Bozutto's arguments as to the "fit" of Bruno's expert witnesses is likewise rejected.

has rendered the Court unable to make such a determination. Therefore, Ms.

Bruno's expert report will be precluded. Bruno's may seek reconsideration of this

decision upon a showing that further factual support exists to establish Ms. Bruno's

qualifications.

## IV.  <u>Conclusion</u>

Bozutto's motion for spoliation sanctions is granted to the extent that the

Court will issue an adverse inference should this matter reach trial. The Court will

not award monetary sanctions at this time, although Bozutto's may renew its

Motion for monetary sanctions in the future. Defendant's motion to exclude expert

witnesses Mr. Dragotto and Mr. Rajan will be denied without prejudice with leave

to renew its objections at such time as the factual record is better developed.

Bozutto's motion to exclude the expert report of Ms. Bruno will be granted.

A separate Order will be issued.


BY THE COURT:

s/Matthew W. Brann
Matthew W. Brann
United States District Judge