IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL BRUNO, LISA BRUNO, BRUNO'S MARKET, INC., AND BRUNO'S MARKET II, INC. | : : : : | No. 3:09-cv-874 (Judge Brann) |
| Plaintiffs, | : : | |
| v. | : : | |
| BOZZUTO'S, INC., | : : | |
| Defendant. | : | |

**MEMORANDUM**

November 19, 2015

Bad decisions early in litigation often have far-reaching consequences. This is one such case. Before the Court is Defendant Bozzuto's, Inc.'s <u>Daubert</u> Motion to Exclude expert reports and testimony offered by Plaintiffs Michael and Lisa Bruno as well as Bruno's Market, Inc., a small supermarket chain the couple owned and operated. On the brink of filing this lawsuit, Ms. Bruno, a CPA with nearly twenty years of accounting experience, destroyed all of her business's financial records, including those saved on a store computer. That spoliation forced Plaintiffs' own experts to rely on secondhand sales projections, figures that those experts subsequently failed to verify. In essence, the very flaws evident in the contested reports exist precisely because their core inputs were drawn from a well

1

that Plaintiffs themselves had poisoned from the outset. Because Plaintiffs' experts

have relied on unverified secondhand data, their reports and testimony exhibit

neither sufficient reliability nor the requisite fit required for admission in federal

practice. The Court therefore grants Defendant's Motion to Exclude in full.

## I.    BACKGROUND

The comprehensive set of facts giving rise to this dispute, a set of facts with

which this Court has garnered a keen familiarity over the years, are set out in full

in this Court's April 23, 2015 Memorandum.[1] Nevertheless, the chain of events

pertinent to Defendant's instant <u>Daubert</u> Motion transpired as follows.[2] The

underlying claims in this action are for contractual breach or alternatively, for

promissory estoppel, both arising from an alleged supply agreement, which

Plaintiffs contend Defendant, a wholesale distributor, ultimately breached.[3] The

contested expert reports therefore have attempted to calculate contract damages.

### A.    Plaintiffs' Destroy Their Business's Financial Records

Ms. Bruno and her husband owned and operated Bruno's Market, Inc., a

small chain of family-owned grocery stores whose flagship operation was situated

near the Susquehanna River on Kennedy Boulevard, in Pittston, Luzerne County,

---

[1]   ECF No. 212.

[2]   Defendant's Renewed Spoliation Motion for Sanctions against Plaintiffs and Motion to
      Preclude Expert Reports and Testimony is docketed at ECF No. 202.

[3]   <u>See</u> ECF Nos. 63, 127.

Pennsylvania. Like any other business, Bruno's Market, Inc. maintained several accounting records detailing its operations and financial condition.[4] When asked what electronic data the store retained, Ms. Bruno testified, "[e]verything on the computer as far as a trial balance, balance sheet, income statement," as well as "sales information."[5] When asked what paper records the store retained, Ms. Bruno stated, "[i]nvoices, sales reports, . . . [and] cancelled checks."[6] In fact, it was also her practice to retain "time clock reports," "[a] lot of employee information," and "operational-related things, bills for electricity . . . for insurance" in hard-copy form in the store's second-floor office.[7] In Ms. Bruno's own words, her store housed "[t]ons of paper records."[8]

Ms. Bruno graduated from Marywood University in Scranton, Pennsylvania in 1988 with a Bachelor of Science degree in accounting.[9] She obtained her CPA license in 1990, after which time she was employed by several different public accounting firms.[10] Ms. Bruno has maintained an active CPA license since 1990 and had therefore had spent at least nineteen years as a CPA by the time she filed

---

[4] ECF No. 202 Ex. 9 at 9.
[5] Id.
[6] Id. at 9–10.
[7] Id. at 10.
[8] Id.
[9] ECF No. 202 Ex. 9 at 16.
[10] Id. at 17.

the instant lawsuit.[11] Renewal of her CPA license required completion of eighty

credit hours every two years in such areas as accounting, auditing, and taxation.[12]

Throughout her accounting career, Ms. Bruno audited the financial records

of several private entities, including grocery businesses.[13] When asked during her

deposition whether she knew about "rules that require companies to keep records

for a certain period of time," she answered affirmatively, stating that she believed

business should retain the sales data supporting the authenticity of their tax returns

for at least "three years."[14] When asked about "what sorts of records are required to

be kept," she responded that businesses must retain their "general ledgers, . . . bank

statements, [and] cancelled checks."[15]

Unfortunately, Ms. Bruno's accounting background would come to bear

upon this litigation in an altogether detrimental way. During discovery, Defendant

requested that Plaintiffs produce "[a]ny and all documents which reflect, refer or

relate to the financial operations of the Pittston Store [from January 1, 2004]

through 2008."[16] The request explicitly sought "any and all balance sheets, profit

and loss statements (for any and all time periods) and complete copies of all

---

[11] Id. at 17.
[12] Id. at 17.
[13] Id. at 18.
[14] Id. at 18.
[15] Id. at 18.
[16] ECF No. 202 Ex. 5 at 8.

federal and state tax returns."[17] When Plaintiffs failed to produce those documents,

defense counsel Glenn A. Manochi, Esq., wrote a letter to Plaintiffs' counsel, Gene

E. Goldenziel, Esq., again requesting that the store's financial records be made

available to Defendant for closer examination.[18] Mr. Goldenziel replied to that

request with a letter of his own, the first line of which bluntly informed Mr.

Manochi that "none of the documents requested in your letter exist."[19]

During his deposition of Ms. Bruno, Mr. Manochi explained that "during the

course of discovery we asked for production of various pieces of information,

[including] trial balances [and] information related to Bruno's Market, Inc., . . . and

we did not receive any."[20] "Do you know why that is?" Mr. Manochi wondered as

he questioned Ms. Bruno.[21] In fact, Ms. Bruno did know why the store's financial

and accounting records did not exist: she had destroyed them years ago. In what is

perhaps the most infamous plot twist in the life of this six-year-old litigation, Ms.

Bruno and her husband "threw [the] records out" when they moved to California in

September 2008, some eight months before filing their Complaint against

Defendant and some fifteen months after they had begun contemplating litigation

---

[17] Id.
[18] ECF No. 202 Ex. 6.
[19] ECF No. 202 Ex. 7 at 2.
[20] ECF No. 202 Ex. 9 at 11.
[21] Id.

in the first place.[22] According to Ms. Bruno, "the paper copies went in the trash"

and even the business computer was "thrown out."[23]

### B.    Plaintiffs' Spoliation Deprives Their Experts Of Reliable Data

The air of impropriety that pervaded Plaintiffs' knowing spoliation of their

business's pertinent financial records played an integral role in this Court's April

23, 2015 Memorandum, which granted in part and denied in part Defendant's

Motion for Sanctions for Spoliation, given how the missing evidence hindered

Defendant's ability to advance certain key defenses.[24] Whether that spoliation, in

conjunction with the admitted decline in Plaintiffs' grocery business in its final

operating year, paints a rather bleak picture of recoverable damages in this case is a

matter reserved for a future date. Be that as it may, the background spoliation issue

bears upon the reliability of the contested reports because Plaintiffs' destruction of

its key financial indicators severely limited the data from which their experts were

able to draw when they engineered their financial models and eventually formed

their expert opinions.

Plaintiffs' experts are James N. Dragotto, J.D., MBA, and Murli Rajan,

Ph.D., MBA. Throughout the course of this litigation, Mr. Dragotto and Dr. Rajan

prepared two expert reports. The first Dragotto-Rajan report was submitted on June

---

[22]  ECF No. 202 Ex. 9 at 11–12, 32.
[23]  ECF No. 202 Ex. 9 at 12.
[24]  ECF No. 212.

3, 2011.[25] Their second report was filed on June 23, 2014.[26] Though Plaintiffs'

experts made certain joint decisions, the general division of labor left Mr. Dragotto

to evaluate Plaintiffs' accounting data, while Dr. Rajan determined the appropriate

financial model to obtain the present value of Plaintiffs' alleged damages.

Specifically, Mr. Dragotto testified that using the income valuation approach

"would be something Dr. Rajan decided."[27] As Dr. Rajan explained during his

deposition, "the reason we wrote it together is because he is the expert in the area

of accounting. . . . I would look to him for guidance . . . in terms of what

information to look at . . . to prepare the projection."[28]

The keystone of Plaintiffs' two expert reports—and the methodological

decision most at issue—was the joint determination by Mr. Dragotto and Dr. Rajan

to use financial projections purportedly created by Defendant to estimate the sales

Plaintiffs' business would realize after 2007. Such resort by Plaintiffs' experts to

Defendant's own internal projections was necessary because Plaintiffs' prior

destruction of evidence left the pair with no other adequate inputs.[29] Those sales

---

[25] ECF No. 202 Ex. 10.

[26] ECF No. 202 Ex. 27.

[27] ECF No. 202 Ex. 18 at 4.

[28] ECF No. 202 Ex. 20 at 3.

[29] The record reveals that Plaintiffs' independent accountant, Joseph Paterson, CPA, actually retained certain combined tax returns for certain of Plaintiffs' businesses for fiscal years 2005 through 2007. ECF No. 202 Ex. 8 at 8–9, 13; ECF No. 202 Ex. 10 at 4, 6. Unfortunately, those returns consolidated tax data belonging to Bruno's Market on the Bruno's Supermarket, Inc. return. ECF No. 202 Ex. 8 at 8–9, 13; ECF No. 202 Ex. 10 at 4, 6. This required

projections were contained in an internal document known as a "pro forma."[30]

Defendant's primary contention as to the validity of Plaintiffs' expert report is that Mr. Dragotto and Dr. Rajan conducted no independent analysis or verification of the sales projections contained in the pro forma, the two experts having essentially taken a "no questions asked" approach when selecting their model's inputs. Relatedly, Defendant contends that the pro forma data was unreliable and did not adequately fit as an input to measure damages because: (i) the projected sales figures in the pro forma were grossly overstated relative to the sales that Plaintiffs' business actually realized; (ii) Defendant had therefore already internally rejected the contested pro forma figures; and (iii) Defendant used the pro forma to conduct a break-even loan analysis, not to project sales or potential contract damages.[31] The sales projections borrowed from the pro forma formed the basis of Plaintiffs' two expert reports. That is a fact undisputed by Plaintiffs' experts and supported by the mathematics underlying their calculations.

---

Plaintiffs' expert Mr. Dragotto to "restate" or "un-consolidate" those returns using a seven-step process he outlined in what has come to be known in this litigation as the Dragotto Memorandum. ECF No. 202 Ex. 10 at 6; ECF No. 202 Ex. 11.Nevertheless, the tax returns did not contain the information required to adequately project Plaintiffs' business's net sales or gross margin. As Dr. Rajan explained, a "starting point" for such sales and expenses projections "would come from an income statement." ECF No. 202 Ex. 20 at 3. Moreover, the restated tax returns, in Mr. Dragotto's own words, "cause total chaos" despite their accounting for what he termed merely a "miniscule impact" on his calculations. ECF No. 33 at 20. As such, Mr. Dragotto and Dr. Rajan ultimately abandoned the use of restated tax returns for their second report. Id.; ECF No. 202 Ex. 27.

[30]  The "pro forma" projection sheet can be found in the record at ECF No. 202 Ex. 19.
[31]  ECF No. 203 at 20–25.

Specifically, Mr. Dragotto and Dr. Rajan used the exact net sales and gross margin figures for 2008 through 2012 as supplied on the pro forma without making any revisions or conducting any independent verification of those numbers. Dr. Rajan testified that "[i]t was a joint decision" to use the projections contained in the pro forma.[32] The two also used total expenses as provided on the pro forma before subtracting out interest and depreciation, numbers which also were extracted from Bozzuto's pro forma.[33] This reliance on the pro forma data was evident from the experts' written reports as well as their testimony during depositions and the Court's <u>Daubert</u> hearing.

During his first deposition, Mr. Dragotto confirmed that the pro forma "is the basis for the report."[34] "[W]e relied on the financial projections made by Bozzuto's," Mr. Dragotto affirmed. The pro forma at issue "was the ultimate one that we utilized."[35] During his second deposition, Mr. Dragotto confirmed that the pro forma "has always from the very beginning been the basis of each of the first

---

[32] ECF No. 202 Ex. 20 at 3.

[33] The Court refers to the contested pro forma as "Defendant's pro forma" for the sake of simplicity. None of those references are meant to decide or recognize as waived any subsequent objection on Defendant's part as to the document's authenticity or hearsay status. The Court is of the opinion that Defendant has to this point preserved such objections. Any possessive references are made solely for the disposition of the instant Motion and are confined to that purpose.

[34] ECF No. 202 Ex. 18 at 6.

[35] ECF No. 202 Ex. 18 at 6–7.

two reports that we did."[36] "I did not project anything. I used their report," Mr.

Dragotto would later emphasize.[37] "I think we've tried to make that totally clear to

everyone throughout this whole matter that the basis for our calculations are

numbers provided by Bozzuto[s]," he said. [38] "What you're trying to do is say that

I made the projections; I didn't, Bozzuto's did," Mr. Dragotto explained, "They're

the ones that said it would be 7.8 million [in sales] the next year, not me. I relied

on their expertise in that field."[39]

    When asked how he obtained the pro forma, Mr. Dragotto could not answer

"[h]ow it actually came into [his] hands" or who provided it to him.[40] When asked

whether he knew how the $150,000 [projected weekly sales] number was arrived

at, Mr. Dragotto stated that although he "believe[d] that [it] was done through a

series of different inquiries," he did not "know the exact methodology" but "ha[d]

a feeling for what was done in getting there."[41] "I'm not concerned with what the

numbers are if they [Defendant] feel this is what the numbers would be," he

stated.[42] "They [Defendant] for some reason . . . ended up with a projection of

$150,000," and "I don't have the luxury of back and seeing everything," so "these

---

[36] ECF No. 202 Ex. 33 at 9.
[37] ECF No. 202 Ex. 33 at 20.
[38] ECF No. 202 Ex. 33 at 20.
[39] ECF No. 202 Ex. 33 at 22.
[40] ECF No. 202 Ex. 18 at 6.
[41] ECF No. 202 Ex. 18 at 8.
[42] ECF No. 202 Ex. 18 at 9.

numbers to me when I'm relying on something else are irrelevant."[43] "So at any point have you asked anybody at Bozzuto's if this was prepared by them?"[44] Mr. Manochi questioned. "I haven't spoken with anybody at Bozzuto's," Mr. Dragotto answered.[45] Mr. Manochi similarly questioned Dr. Rajan as to whether he knew why Bozzuto's prepared the pro forma to begin with.[46] "Presumably to provide the Brunos with an idea of how the supermarket would do," Dr. Rajan answered.[47] "And where does that presumption come from?" Mr. Manochi asked.[48] "I might have read something in some of the documents that I went through that suggested that," Dr. Rajan explained.[49]

According to Mr. Dragotto, it was sufficient for him to rely on the numbers in Defendant's pro forma without investigation because he believed that he was "relying on something in which a lot of due diligence was done on," due diligence that he suspected included a market study.[50] When pressed by Mr. Manochi on whether he ever "rel[ied] on anything called a market survey in connection with the report that [he] prepared in June 2014," Mr. Dragotto could only state that

---

[43] ECF No. 202 Ex. 18 at 9–10.
[44] ECF No. 202 Ex. 33 at 24.
[45] ECF No. 202 Ex. 33 at 24.
[46] ECF No. 202 Ex. 20 at 11.
[47] ECF No. 202 Ex. 20 at 11.
[48] ECF No. 202 Ex. 20 at 11.
[49] ECF No. 202 Ex. 20 at 11.
[50] ECF No. 202 Ex. 18 at 10.

"[he] may have reviewed or seen documentation."[51] If other considerations "didn't matter to them [Defendant], it's not going to matter to me," Mr. Dragotto stated.[52] When asked if he had conducted "any independent review of Bruno's books and records to determine if [the pro forma] was accurate," Mr. Dragotto replied that "[A]ll of the scrutiny was done by Bozzuto's. I did not feel that there was a need to. . . . Because they were in the best position."[53] "So you didn't feel the need as an expert in this case to go back and look at the original books and records?" Mr. Manochi wondered.[54] "I did not," Mr. Dragotto responded. "I relied on Bozzuto's being the experts," Mr. Dragotto stated.[55] "One hundred percent?" Mr. Manochi asked. "One hundred percent," Mr. Dragotto replied.

The same stance was evident from Dr. Rajan's deposition testimony. He did not conduct "any independent investigation to verify the numbers in the [pro forma]," because "these are Bozzuto's projections."[56] "You're comfortable relying solely on [them]?" Mr. Manochi asked.[57] "I would say that they probably have most of the expertise when it comes to making projections in their own field," Dr.

---

[51] ECF No. 202 Ex. 33 at 28.
[52] ECF No. 202 Ex. 18 at 10.
[53] ECF No. 202 Ex. 33 at 10–11.
[54] ECF No. 202 Ex. 33 at 11.
[55] ECF No. 202 Ex. 33 at 23.
[56] ECF No. 202 Ex. 20 at 4.
[57] ECF No. 202 Ex. 20 at 4.

Rajan responded.[58] "Let me just repeat again that our report makes it very clear that we relied on the projections provided by Bozzuto's in developing our numbers," Dr. Rajan explained.[59] "So . . . you did not do any separate analysis of the competition in the area? Mr. Manochi questioned.[60] "No, I did not," Dr. Rajan responded.[61] "And do you know if Mr. Dragotto did?" Mr. Manochi asked.[62] "I don't believe he did, no." Dr. Rajan replied.[63]

The two expert reports filed by Mr. Dragotto and Dr. Rajan confirm that the basic input on which they relied—the projected sales and gross margins for Plaintiffs' grocery business—were drawn exclusively from Defendant's pro forma projection sheet. Both reports state that "[i]n arriving at our opinion of economic damages we have relied upon information sources including, but not limited to, . . . financial projections provided by Bozzuto's."[64] As confirmed at length in the two experts' depositions, those financial projections included the sales figures, gross margins, and total expense numbers supplied on Defendant's pro forma projection sheet. Under the heading titled "Methodology and Assumptions used for the Calculation of Reduced Equity Value," both reports state that "[a]s previously

---

[58] ECF No. 202 Ex. 20 at 4.
[59] ECF No. 202 Ex. 20 at 8.
[60] ECF No. 202 Ex. 20 at 8.
[61] ECF No. 202 Ex. 20 at 8.
[62] ECF No. 202 Ex. 20 at 8.
[63] ECF No. 202 Ex. 20 at 8.
[64] ECF No. 202 Ex. 10 at 4; ECF No. 202 Ex. 27 at 4.

noted, we have relied on financial projections made by Bozzuto's."[65] That section goes on to confirm that "[w]e use projected sales as provided by Bozzuto's, who assume an annual rate of growth in sales of 3%"; that "[g]ross margins are based on Bozzuto's assumption of 26.48% of sales"; and that "[w]e take total expenses as provided by Bozzuto's and subtract out interest expenses and depreciation."[66] Likewise, "Text Table 2" in both reports indicates that "Free cash flow is obtained by applying a gross margin of 26.48% to net sales. These values are provided by Bozzuto's."[67]

Furthermore, as a matter of the mathematics underlying the proposed valuation, the projections borrowed from Defendant's pro forma sheet played a significant in Plaintiffs' experts' calculations. To arrive at their ultimate damages figure, Plaintiffs' experts totaled the discounted free cash flow as projected for the years 2008 through 2013. In fact, net sales and gross are the starting point for the free cash flow to the firm calculation, figures from which various taxes and operating expenses are later subtracted. Thus, net sales and the accompanying gross margin have a significant impact on the resulting output in a present value model like the one at issue here. Essentially, selecting a base quantity in a growth model is perhaps the most important determinant of the model's ultimate

---

[65] ECF No. 202 Ex. 10 at 4; ECF No. 202 Ex. 27 at 5.
[66] ECF No. 202 Ex. 10 at 5; ECF No. 202 Ex. 27 at 5.
[67] ECF No. 202 Ex. 10 at 7; ECF No. 202 Ex. 27 at 7.

magnitude, especially when assuming a modest growth rate, as was the case in the contested models.[68]

### C. Defendant's Expert Reports Criticize The First Dragotto-Rajan Report

The first and second Dragotto-Rajan reports are largely similar, particularly in regard to those portions of the reports with which Defendant has taken issue. Accordingly, the precise history of the sequence of revised reports exchanged between the experts for both parties is of less relevance to this discussion than it was to the Court's Spoliation Memorandum.[69] Nevertheless, a brief overview of the contentions made by Defendant's experts is instructive, as certain of those critiques relate directly to the sufficiency of Plaintiffs' experts' chosen inputs.

Defendant and its experts have raised significant doubts about Plaintiffs' experts' unbridled use of the pro forma in their analysis. Specifically, the initial expert reports prepared on behalf of Defendant by John A. Slavek, CPA, CFF, and David M. Duffus, CPA/ABV/CFF, CFE, indicated that the missing financial data rendered the conclusions of Plaintiffs' experts flawed and inherently unreliable.[70]

---

[68] Of course, choosing an appropriate growth rate and whether that rate is positive or negative also influences the trajectory of such a model and is also likely a valid point of contention in this case. The Court emphasizes here that selection of an inflated base quantity, which is thereafter compounded in a growth model, can significantly bias that model's ultimate magnitude.

[69] ECF No. 212.

[70] ECF No. 202 Exs. 12, 14.

According to Mr. Slavek, Plaintiffs' missing financial data significantly hampered his ability to "reach any opinion . . . to a reasonable degree of certainty" as to: (1) the profitability of Bruno's Market between April 1, 2006 and May 1, 2007; (2) the accuracy of the numbers used in the First Dragotto-Rajan Report; and (3) the financial condition of Bruno's Market between April 1, 2004 and May 31, 2007.[71] Nevertheless, Mr. Slavek suggested that "Bruno's Market was not operating profitably during [2006–2007] and might well have had to close the Pittston store based solely on its poor financial condition."[72] Likewise, Mr. Duffus observed that the missing financial records prevented the completion of "a report which properly assesses Bruno's Market's financial condition and its alleged damages."[73]

At that point in the litigation, Defendant filed its initial Motion for Sanctions against Plaintiffs based upon Plaintiffs' spoliation of evidence.[74] Though the Honorable Robert D. Mariani, writing for this Court, ultimately concluded that while Plaintiffs "did destroy original paper records that had been used to tally final sales figures, expenses, and net income," the extent to which Defendant was prejudiced in fact depended on the availability of ancillary electronic records,

---

[71]  ECF No. 202 Ex. 12 at 15.
[72]  ECF No. 202 Ex. 12 at 15.
[73]  ECF No. 202 Ex. 14 at 12. Mr. Duffus would reinforce such critiques of Plaintiffs' experts' reports at the Daubert hearing, primarily by questioning the reliability of a report whose authors, in Mr. Duffus's view, simply plugged available data into their models without questioning the veracity or suitability of such figures.
[74]  ECF No. 94.

which Plaintiffs asserted were likely available through the computer system owned

by their supplier, Associated Wholesalers, Inc. (AWI).[75] Specifically, Judge

Mariani wrote that "Plaintiffs admitted that they had thrown out the paper copies

but insisted the records still existed in electronic form with AWI."[76] In his Order,

Judge Mariani directed Plaintiffs "to take such actions as are necessary to obtain

original source materials from the [ ] system in AWI's possession and to bear all

costs associate with such retrieval."[77]

Despite Plaintiffs' contention that the electronic records still existed in

AWI's possession and despite an attempt to subpoena such records, AWI

responded that Plaintiffs were incorrect and that it actually did not retain such

data.[78] In reality, AWI asserted that financial records were "maintained only at the

retail store's location" and were "not, at any point, pulled back to AWI."[79]

### D.   Plaintiffs' Restored Financial Data Reveals That Actual Sales Fell Well Below The Pro Forma's Projections

As it turned out, however, all was not lost. On June 19, 2012, Mr.

Goldenziel sent to Mr. Manochi an email with electronic files he had received from

---

[75]  ECF No. 127 at 11–12.
[76]  ECF No. 127 at 3.
[77]  ECF No. 127 at 13.
[78]  ECF No. 202 Ex. 16.
[79]  ECF No. 202 Ex. 16 at 1.

FMS Solutions.[80] The email contained six different attachments, comprising of five hundred and sixteen (516) pages of sales data from Plaintiffs' supermarket.[81] Mr. Goldenziel's June 2012 production of the data occurred approximately seven and one-half months after the November 2011 conclusion of the fact discovery period.[82] This newly discovered data essentially contained portions of Bruno's Market's general ledger for the week ending July 8, 2006 through the week ending May 12, 2007.[83]

On August 23, 2012 and in light of this uncovering of certain relevant portions of the missing data, Mr. Goldenziel requested that Ms. Bruno file an affidavit to "reconcile the documents prepared by FMS" with what little data already existed.[84] The key takeaway from Ms. Bruno's affidavit was that Bruno's Market's sales for the 2006 fiscal year, i.e., the fiscal year ending March 31, 2007, totaled $6,211,555.49.[85] According to Ms. Bruno, this number was significant because it was used to report the final tax return before the events giving rise to

---

[80] FMS Solutions is a servicer of independent supermarket operations, whose core services including providing accounting and payroll outsourcing, financial software application and related services, treasury management, human resource services, etc.
[81] ECF No. 150 Ex. 19–24.
[82] ECF No. 202 at 18.
[83] ECF No. 202 at 18; ECF No. 212 at 6.
[84] ECF No. 202 Ex. 21 at 2.
[85] ECF No. 202 Ex. 21 at 3.

this action transpired.[86] In fact, as Ms. Bruno noted, the data on the return were for the fiscal year ended just forty-four days prior to the alleged breach of contract.[87]

The core problem that Ms. Bruno's actual sales revelation caused can be ascertained with simple math. If the actual fiscal year sales figure of $6,211,555.49 for the store's final operating fiscal year is divided by 52 weeks to obtain a weekly figure, the calculation yields $119,452.99 sales per week, or approximately $120,000.00 per week for the sake of simplicity. As should be evident, the actual sales figures fell well below the projected ones that Plaintiffs' experts borrowed from the pro forma sheet. In fact, the pro forma estimate of annual sales, which totaled $150,000.00 per week, necessarily overstated actual sales at Plaintiffs' store by approximately $30,000.00 per week or $1,560,000.00 annually.

Such discrepancies were later reinforced when Plaintiffs used the FMS data to restore certain of the store's financial records, including a recreated profit and loss statement as well as a recreated balance sheet.[88] Those recreated financial records revealed that for the time period of July 1, 2006 through March 31, 2007,

---

[86] ECF No. 202 Ex. 21 at 3. The underlying claims in this case are contractual breach and promissory estoppel, a fact that unfortunately has been overshadowed by Plaintiffs' spoliation and now by their experts. Nevertheless, the Court notes that certain procedural determinations often tend to impact a case's underlying substantive issues in important ways. Parties are therefore well advised to consider the effects that this Court's rulings on spoliation and inadmissibility of certain expert witnesses will have on the merits of Plaintiffs' underlying claims.

[87] ECF No. 202 Ex. 21 at 3.

[88] ECF No. 202 at 20; ECF No. 212 at 7.

Bruno's Market lost $188,147.69 overall, with a $199,209.00 loss occurring during April and May of 2007 alone, the final months leading up to the closure of Plaintiffs' Pittston store.[89] Such results have also emboldened Defendant to contest the core elements of causation and damages underlying Plaintiffs' claim, contentions that admittedly bear slight relevance to the disposition of the instant Motion but will undoubtedly carry comparatively heavy weight in the Court's consideration of dispositive motions.

### E.    Plaintiffs' Experts Disregard The Restored Financial Data

One might expect that this discovery of the actual data and its sharp divergence from the projected pro forma numbers would necessitate a significant overhaul of Plaintiffs' expert report. Perhaps such a revision would have saved its viability. Regardless, to Defendant's and this Court's surprise, Plaintiffs' experts submitted a revised report on June 23, 2014, in which Mr. Dragotto and Dr. Rajan again elected to utilize the numbers from the pro forma projection sheet rather than the actual recreated sales data—pro forma figures that unquestionably yielded a significantly higher damages estimation than what would have resulted had the experts conservatively employed the actual data.

When asked during his first deposition about certain portions of the actual sales data that had materialized after his co-writing the first report, Mr. Dragotto

---

[89]   ECF No. 202 Ex 24 at 9; ECF No. 202 Ex. 25 at 6.

stated that he "neither had it nor if [he] did . . . would [he] consider it."[90] A few months following that deposition, Mr. Dragotto submitted an affidavit to this Court in support of Plaintiffs' opposition to Defendant's Motion to Reopen discovery.[91] That affidavit, signed by Mr. Dragotto on August 23, 2012, stated that "subject to the penalties . . . relating to unsworn falsification to authorities," it was Mr. Dragotto's opinion that "gross receipts equal $6,211,555."[92] Even so, Mr. Dragotto would continue to use the inflated pro forma numbers in the June 23, 2014 report, approximately two years after he offered that affidavit. Mr. Manochi would also ask Dr. Rajan about potential discrepancies between the projected pro forma and the sales numbers that Plaintiffs' store actually realized. "What really matters though is what Bozzuto's thought Bruno's could grow at, correct?" Dr. Rajan questioned in response.[93] "You're the expert," Mr. Manochi replied.[94] "Yes, I answered my own question," Dr. Rajan said.[95]

For the sake of completeness, Plaintiffs' experts did make one small change in their revised report of June 23, 2014 that was at least tangentially related to sales. When calculating the change in net working capital, a rather insignificant

---

[90] ECF No. 202 Ex. 18 at 9.
[91] ECF No. 202 Ex. 22.
[92] ECF No. 202 Ex. 22 at 2.
[93] ECF No. 202 Ex. 20 at 11.
[94] ECF No. 202 Ex. 20 at 11.
[95] ECF No. 202 Ex. 20 at 11.

quantity in their model, the pair deflated the 2008 net sales number of $7,800,000.00 by 3% to arrive at an estimate for 2007 net sales of $7,606,034.00.[96] That adjustment was only made to obtain the increase in net working capital, an input that Mr. Dragotto himself repeatedly (and correctly) referred to as "miniscule."[97] Even considering that adjustment's minor impact on the overall damages estimation, it is not apparent how the two experts were content in assuming either a $7,606,034.00 figure or a $7,572,815.00 figure for 2007, knowing full well that the actual number registered at exactly $6,211.555.49.

Moreover, the two experts, now having in their possession the actual data and having attested to the fact that the actual net sales number for 2007 totaled $6,211.555.49, did nothing to adjust the net sales projection in their calculation of free cash flow to the firm, the portion of their calculation that in financial terms was doing the brunt of their model's work. Specifically, once Plaintiffs' experts had calculated the yearly free cash flow to the firm (a calculation guided largely by the total sales input), they arrived at their ultimate damages projections by taking the sum of the present values of such annual free cash flow outputs. Consequently, Plaintiffs' experts' projections essentially proceeded from a base year whose sales figures were wholly overstated in reality. That decision is unquestionably the most

---

[96] ECF No. 202 Ex. 10 at 7.
[97] See, e.g., ECF No. 33 at 20.

troubling one made by Plaintiffs' experts, and the one that gave this Court most

pause when deliberating on the matter. As Mr. Manochi pointed out during the

<u>Daubert</u> hearing before this Court, Plaintiffs' experts' effectively created over $1.3

million in sales "out of thin air"—an impermissible extrapolation whose effects

were further compounded with each subsequent yearly valuation.

### F.   Plaintiffs' Experts Have Misjudged Defendant's Purposes For Creating The Pro Forma

As Defendant further suggests, such reliance on the pro forma numbers is

also inaccurate because Plaintiffs' experts did not understand the internal purposes

for which Defendant created that document. According to Daniel J. Brock, the

Vice President of Sales for Defendant who has been with the company for over

twenty-eight years, the primary internal purposes for creating a pro forma sheet in

the first place are "[t]o determine if Bozzuto's should make a loan" and "to

determine the break-even point of a store's operations"—not to create a document

that could form the basis of sales or damages projection.[98] According to Mr. Brock,

that was exactly the case with the pro forma in this case, Defendant having

intended to use the pro forma solely "[t]o determine if Bozzuto's would consider

entering into an agreement with Plaintiffs" whereby it would supply groceries to

---

[98]  ECF No. 202 Ex. 34 at 2–3.

23

Plaintiffs' store and pay off Plaintiffs' outstanding loan from AWI.[99] After considering the picture that its pro forma revealed, Mr. Brock explained that "Bozzuto's declined to become the grocery supplier for Bruno's Market or pay the AWI Loan," both for reasons that have tended to gain credence in this Court's mind as this litigation has unfolded.[100]

Finally, beyond both Plaintiffs' spoliation of evidence and Plaintiffs' experts' decision to base their entire analysis on unverified projections is the fact that Defendant itself had come to disavow the numbers in the contested pro forma as inaccurate during early 2007 and therefore well before Plaintiffs' expert reports were even written. In fact, Mr. Brock testified that Defendant actually prepared several pro formas in this case, ultimately concluding that the one projecting Plaintiffs' sales at $120,000.00 per week was more accurate, given that actual sales had fluctuated around $110,000.00 per week during the relevant timeframe.[101] According to Mr. Brock, he had already concluded that the pro forma that Plaintiffs' experts chose to use "was not acceptable" as early mid-March 2007.[102] This was so, he explained, "because Bruno's Market's weekly sales had been

---

[99]  ECF No. 202 Ex. 34 at 3.
[100]  ECF No. 202 at 34, Ex. 4.
[101]  ECF No. 202 Ex. 34 at 5.
[102]  ECF No. 202 Ex. 34 at 5.

deteriorating since at least April 2006 and because Bozzuto's knew that."[103] Emails

supplied by Mr. Brock after the <u>Daubert</u> hearing and at the request of Plaintiffs'

counsel confirm Mr. Brock's suggestions. In fact, Mr. Brock states as follows in an

email dated Tuesday, March 13, 2007:

> Lisa's copy of the pro forma is attached.
>
> . . .
>
> Lisa's sales per week were listed at $120,000. The supporting data . . . showed that the last 9 weeks averaged $110,000. I changed the sales in my copy to show $110,000. Big question, why are sales declining??[104]

### G.   This Case's Relevant Procedural History Includes A Spoliation Motion, A <u>Daubert</u> Hearing, And The Instant Motion To Exclude

Defendant filed its Renewed Spoliation Motion for Sanctions against

Plaintiffs and Motion to Preclude Expert Reports and Testimony on January 16,

2015.[105] On April 23, 2015, the Court issued a Memorandum Opinion and

accompanying Order granting Defendant's Spoliation Motion but delaying

---

[103]   ECF No. 202 Ex. 34 at 5.

[104]   <u>See, e.g.</u>, ECF No. 248 at 5. Not only does this corroborate Mr. Brock's contention regarding Defendant's abandonment of the $150,000 pro forma on which Plaintiffs' experts relied, but perhaps it also suggests that Plaintiffs themselves were aware of and potentially even involved in these downward revisions and therefore had good reason to believe that the $150,000.00 pro forma was inherently unreliable. During their depositions and the Daubert hearing, Plaintiffs' experts indicated that they saw several pro formas, and that the $150,000.00 one was the one on which Plaintiffs and Defendant had settled.  This Court wonders then if perhaps Plaintiffs' experts were not given the full story or if proceeding with the $150,000.00 pro forma was entirely their own decision based upon its evident propensity to yield the highest damages output.

[105]   ECF No. 202.

imposition of monetary sanctions.[106] A Daubert Hearing was then scheduled to address the expert admissibility portion of Defendant's Motion.[107] That hearing was ultimately held before the Court on October 1, 2015.[108] Because the Court finds that Plaintiffs' experts' decision to use the pro forma projections renders their opinion inherently unreliable, Defendant's Motion to Exclude Plaintiffs' Expert Reports and Testimony is now granted in full.

## II.   LAW

Federal Rules of Evidence 702 and 703 govern the admissibility of expert testimony. They provide as follows:

> **Rule 702. Testimony by Expert Witnesses**
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.[109]

---

[106]   ECF Nos. 212–13.
[107]   ECF No. 223.
[108]   ECF No. 229.
[109]   Fed. R. Evid. 702.

**Rule 703. Bases of an Expert's Opinion Testimony**
An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.[110]

In 1993, the Supreme Court of the United States set out the standard for admissibility of expert testimony in federal court in Daubert v. Merrell Dow Pharm., Inc.[111] The Court in Daubert delegated to district courts a "gatekeeping responsibility" under Rule 702, which requires them to "determine at the outset" whether an expert witness can "testify to (1) scientific knowledge that (2) will assist the trier of fact."[112] That gate-keeping function demands an assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid" as well as "whether that reasoning or methodology properly can be applied to the facts in issue."[113] Daubert also clarified that the proponents of the expert must establish admissibility by a preponderance of the evidence.[114]

---

[110] Fed. R. Evid. 703.
[111] 509 U.S. 579 (1993).
[112] Daubert, 509 U.S. at 592.
[113] Daubert, 509 U.S. at 592–93.
[114] Daubert, 509 U.S. at 592 n.10 (citing Bourjaily v. United States, 483 U.S. 171, 175–76 (1987)). See also In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994) (Becker, J.) ("This does not mean that plaintiffs have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their

Though it recognized that "many factors" are relevant to this inquiry and that "a definitive checklist or test" does not exist, the <u>Daubert</u> Court enumerated four relevant questions for district courts to consider when making the Rule 702 determination: (1) whether the disputed methodology is testable; (2) whether the disputed methodology has been peer-reviewed; (3) the methodology's known or potential rate of error; and (4) whether the methodology is generally accepted in the relevant scientific community.[115]

<u>Daubert</u> explained that district courts should conduct this inquiry in addition to that already mandated by Federal Rules of Evidence 703, which governs admission of expert testimony using data reasonably relied upon by experts in a particular field, and Federal Rule of Evidence 403, which permits exclusion of relevant evidence whose "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[116] A district court "exercises more control over experts than over lay witnesses," the Supreme Court observed, since "[e]xpert evidence can be both powerful and quite misleading

---

experts are <u>correct</u>, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.").

[115] <u>Daubert</u>, 509 U.S. at 593–94.

[116] Fed. R. Evid. 403.

because of the difficulty in evaluating it."[117] Six years later, in <u>Kumho Tire Co. v. Carmichael</u>, the Supreme Court extended <u>Daubert's</u> holding as well as the district court's gate-keeping role beyond scientific expert testimony to all expert testimony based on "technical" or "other specialized knowledge."[118]

In 1994, the United States Court of Appeals for the Third Circuit issued its interpretation of <u>Daubert</u> in <u>In re Paoli R.R. Yard PCB Litig.</u>, a decision known as <u>Paoli II</u>.[119] <u>Paoli II</u> cast the expert admissibility determination in light of three requirements: (1) qualification; (2) reliability; and (3) fit.[120] The qualification prong demands that the proffered expert possess sufficient "specialized knowledge" to testify as an expert.[121] The Third Circuit has interpreted this requirement broadly.[122] In this Court's view, the requirement that does the most work is naturally that of reliability. To satisfy the reliability prong, an expert's opinion "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'"[123] <u>Paoli II</u> set forth an additional four factors to those provided in <u>Daubert</u>. That list of factors, which "a district

---

[117] <u>Daubert</u>, 509 U.S. at 595 (quoting Hon. Jack B. Weinstein, <u>Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended</u>, 138 F.R.D. 631, 632 (1991)).
[118] 526 U.S. 137 (1999).
[119] 35 F.3d 717, 730 (3d Cir. 1994).
[120] <u>Id.</u> at 741–43.
[121] <u>Id.</u> at 741.
[122] <u>See</u> <u>id.</u>
[123] <u>See</u> <u>id.</u> at 742 (quoting <u>Daubert</u>, 509 U.S. at 589).

court should take into account," reads as follows:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.[124]

With regard to the third prong, fit, the Paoli II Court explained that admissibility "depends . . . on 'the proffered connection between the scientific research or test result . . . and [the] particular disputed factual issues.'"[125] In recognition then of Paoli II's interpretation of Daubert, Third Circuit courts confronting expert witness issues have recognized that admissibility requires a proffered expert to surpass "a trilogy of restrictions": qualification, reliability and fit.[126]

## III.   ANALYSIS

The Court now analyzes the proffered expert reports and testimony in light of Daubert, Paoli II, the Court's Daubert hearing, and Federal Rules of Evidence 702 and 703. Because the contested expert reports and testimony employ unreliable methodology, use inflated projections as the base inputs for their calculations, and fail to satisfy the applicable factors, they are excluded in full.

---

[124] See Paoli II, 35 F.3d at 742 n.8.
[125] See id. at 743 (quoting United States v. Downing, 753 F.2d 1224, 1237 (3d Cir. 1985)).
[126] See Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).

**A.     The Contested Expert Reports And Testimony Are Unreliable And Lack Fit Because They Are Based Entirely On Unverified Data, Upon Which No Reasonable Expert Would Rely To Perform A Contract Damages Projection.**

If the instant dispute could be summarized in one question, then perhaps Mr. Manochi did just that when he wondered on his first cross-examination to Dr. Rajan at the Court's <u>Daubert</u> hearing if Dr. Rajan was familiar with the saying "garbage in, garbage out." Mr. Manochi's question pointed to the first fatal flaw in the contested reports and testimony: the use of unreliable and unverified inputs necessitated by Plaintiffs' initial spoliation of their financial data.

Striking expert evidence due to its reliance on questionable data is not a novel course of action among Pennsylvania federal courts. In fact, a recent leading case, <u>Legendary Art, LLC v. Godard</u>, decided by then-United States Magistrate Judge L. Felipe Restrepo, addressed this exact evidentiary issue.[127] <u>Legendary Art</u> involved a report "offered to establish a range of fair market values" for a business in a breach of contract action.[128] The movant argued that the contested report utilized data that were "unreliable, rendering [the expert's] conclusions speculative and inadmissible."[129]

The plaintiff in <u>Legendary Art</u> commissioned an external advisor to conduct

---

[127] No. CIV.A. 11-0674, 2012 WL 3550040 (E.D. Pa. Aug. 17, 2012).
[128] <u>Id.</u> at *1.
[129] <u>Id.</u>

a valuation of its business. The valuation report relied upon a business plan that contained profit and loss projections Plaintiff itself had developed.[130] It was undisputed that the expert in <u>Legendary Art</u> "did not conduct any independent research," "reference[d] no market surveys or studies," and had not "engaged in any independent verification of the projections."[131] The expert "could not specify on what basis, or by whom, the profit projections were generated."[132] Instead, he merely "assumed the validity of the projections."[133]

Judge Restrepo concluded that the contested opinions "are unreliable and do not rest on good grounds."[134] The underlying profit and loss projections operated as "the linchpin" of the expert's opinion, yet he did nothing to verify them.[135] The expert's "reliance on projections . . . without independent verification, renders his analysis unreliable," Judge Restrepo wrote.[136] Critically, the court reaffirmed that:

> Rule 703 "is certainly not satisfied . . . where the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who had a financial interest in making an accurate prediction."[137]

---

[130] <u>Id.</u>
[131] <u>Id.</u>
[132] <u>Id.</u>
[133] <u>Id.</u>
[134] <u>Id.</u> at *4.
[135] <u>Id.</u>
[136] <u>Id.</u>
[137] <u>Id.</u> (quoting <u>ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.</u>, 249 F.Supp.2d 622, 695 (E.D.Pa.2003)).

The analysis in <u>Legendary Art</u> comfortably fits the facts at hand, and this Court finds that case highly instructive. <u>Legendary Art</u> and the decisions upon which it relies stand for the proposition that blind adherence to data absent any sort of independent investigation stops short of the type of reliability contemplated by <u>Daubert</u> and <u>Paoli II</u>. Like the expert in <u>Legendary Art</u>, Plaintiffs' experts here admittedly relied solely on Defendant's pro forma projections, conducted no independent investigations into the validity of those projections, and had no knowledge of the details surrounding their generation. They, like the excluded <u>Legendary Arts</u> expert, "assumed the validity of the projections."

Plaintiffs' primarily argue that <u>Legendary Arts</u> and related cases are distinguishable because the contested projections in this matter are not self-serving, but are inherently reliable due to their alleged production by the Defendant. Though this Court recognizes that utilization of self-serving data was a factor in <u>Legendary Arts</u>, it was just one consideration amongst a myriad of others that militated for exclusion. In other words, although this Court reads <u>Legendary Art</u> and its supporting authorities as holding that self-serving data is one factor useful in determining admissibility, it is certainly not the only factor—and not even the most important one. Instead, the crux of the <u>Legendary Arts</u> decision and the authorities from which it draws is that experts who use data in their reports without

33

independently verifying the accuracy or reliability of those figures fail to satisfy this Circuit's reliability requirement. That independent verification is particularly important where, as here, the contested experts lack familiarity with the pertinent industry.[138] Even given that argument, as discussed more fully in Part III.B below, the facts actually suggest that the experts' decision here to use the inflated pro forma projections instead of the actual sales data was itself highly self-serving.

Moreover, Plaintiffs' experts were wholly unfamiliar with the methodology or purposes underlying the pro forma. They were not involved in data gathering or composition of the pro forma; they merely took what Defendant gave them. In fact, it is apparent that Plaintiffs' experts sole connection with the composition of the pro forma came either from what Plaintiffs or their counsel chose to inform them of or what they remembered from certain discovery documents they were given to review—conduits that the evidence reveals were inadequate to furnish the experts with the requisite background information. The experts' memories as to whether a market study had been conducted, how many pro formas were generated, and which pro forma was in fact the final one on which Defendant relied were largely

---

[138] See, e.g., JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc., No. CIV. A. 97-CV-0652, 1998 WL 175888, at *7 (E.D. Pa. Apr. 15, 1998), aff'd, 178 F.3d 1279 (3d Cir. 1999) (excluding proffered expert who "knew very little about [the relevant] industry" and "did not perform or review any market surveys or studies"); ID Sec. Sys. Canada, Inc., 249 F. Supp. 2d at 695 ("lack of familiarity with the methods and the reasons underlying [his source's] projections virtually precluded any assessments of the validity of those projections through cross-examination").

incomplete and often contradicted by Defendant's own testimony and internal

documentation.

Courts in this Circuit are not the only ones to have spoken on this particular

issue. In fact, the case law unearthed by Defendant in its briefing painted a very

broad picture of the legal landscape addressing expert reliance on unverified data.

Two cases in the venire of the United States Court of Appeals for the Seventh

Circuit are highly instructive, precisely on the issue of experts borrowing data from

an adverse party. First, in Target Market Publishing, Inc. v. ADVO, Inc., the

Seventh Circuit affirmed a district court's exclusion of a plaintiff expert's contract

damages analysis under Daubert because it "relie[d] upon mere assumptions . . .

from which no reasonable inference of lost profits could be drawn."[139]

The plaintiff in Target Market Publishing utilized certain of the defendant's

own projections and analyses, including potential profitability figures and

marketing plans, to forecast lost profits arising from a breach of contract.[140]

Plaintiff's experts in that case, as here, made overzealous estimations of potential

sales, even in light of actual data that indicated otherwise. For instance, the experts

in Target Market Publishing "assumed [ ] that certain errors and inefficiencies that

plagued the [market] experiment in the initial months would be remedied in

---

[139]   136 F.3d 1139 (7th Cir. 1998).
[140]   See id. at 11444.

subsequent months" and "also assumed that [the product] would penetrate into [more] marketing zones, that each zone would generate [more] advertisers per monthly issue, and that virtually all of those advertisers would pay the full price for their adds."[141] The inflated sales projections made by the <u>Target Market Publishing</u> expert are similar to those at issue here, especially those that were made by Plaintiffs' experts and never subsequently revised despite the clear downturn in sales suffered by the Pittston store during its final months of operation.

"Given the declining [customer] participation . . . and the apparent failure to attract [customers]," even that "limited projection seemed unwarranted," the Seventh Circuit observed, noting that the evidence simply was "not sufficient to render the [ ] report's optimistic assumptions plausible."[142] Specifically with regard to the contention that plaintiff's expert had used Defendant's own data, the Seventh Circuit framed plaintiff's argument as follows—a framing that could be transposed without even minor conflict to the present matter: "If [Defendant] itself believed at this late date that [the product] could generate such profits, then how could the court find [the expert's] more conservative figures unduly speculative?"[143] The Seventh Circuit refused to accept that contention, reasoning that "[t]he problems

---

[141] <u>See</u> <u>id.</u>
[142] <u>Id.</u>
[143] <u>Id.</u> at 1145.

with this argument lie in the timing and in the details."[144] Much akin to

Defendant's break-even analysis justification here, the court in <u>Target Market</u>

<u>Publishing</u> found that the projections were "identifying a target profit, not making

a projection of actual profits" and that the projections "sought to demonstrate what

[the product's] profits might be given certain assumptions that had not yet, and

might never, come to pass."[145] The expert reports were correctly excluded because

they were based on what turned out to be "implausible assumption[s]."[146]

These sentiments were echoed in a case before the United States District

Court for the Northern District of Illinois, <u>Otis v. Doctor's Associates, Inc.</u>[147] <u>Otis</u>

involved a claim for lost profits stemming from a failed business agreement.[148] The

calculations performed by the plaintiff's expert in <u>Otis</u> were "based exclusively on

projections contained in [the parties' business agreement]."[149] Plaintiff's expert

"did not perform any independent market analysis to verify the reasonableness or

accuracy of the projections in the [agreement]" and did not "perform any

comparative analysis."[150]

The court in <u>Otis</u> held that the plaintiff expert's lost profit estimations were

---

[144] <u>Id.</u>
[145] <u>Id.</u>
[146] <u>See id.</u>
[147] No. 94 C 4227, 1998 WL 673595 (N.D. Ill. Sept. 14, 1998).
[148] <u>See id.</u> at *1.
[149] <u>See id.</u>
[150] <u>Id.</u>

not based on "scientific knowledge" under Federal Rule of Evidence 702 because "[m]ost importantly, [plaintiff] ha[d] made no showing that the formula and projected values [the expert] relied on [was] accurate or ha[d] been tested for accuracy."[151] "[The expert] himself admitted that he had not performed any independent analysis of the reliability or factual accuracy of the figures."[152] "Other than citing the target estimates in the [agreement], [plaintiff] ha[d] failed to establish that the average weekly sales estimates in the [agreement] ha[d] any basis in fact or . . . market reality."[153] "Finally, [plaintiff] ha[d] not shown that [its expert's] lost profits formula account[ed] for possible future trends in the . . . business."[154]

"Basically," the Otis court wrote, plaintiff "failed to show any proof that [its expert's] lost profits estimates ha[d] been subjected to any testing to verify the accuracy of the numbers [he] used or the accuracy of [his] conclusions."[155] That court concluded that the Daubert factors also required it to exclude the proffered testimony because the plaintiff presented "no evidence indicating that the methodology [its expert] used [was] anything more than an exercise in arithmetic

---

[151] Id. at *4.
[152] Id.
[153] Id.
[154] Id.
[155] Id.

based on inherently unreliable values.[156] That is precisely Defendant's argument in this case, and as in <u>Otis</u>, it is highly persuasive.

Moreover, on the issue of unreliable methodology, Plaintiffs advance the counterargument, as most proponents of contested experts do, that Defendant's objections go primarily to the weight of the experts' testimony and not to its threshold admissibility. The Court simply cannot agree with that suggestion in this case. Although certain surface-level flaws pertaining to methodology or data collection may be overlooked and reserved assessment of credibility, federal courts have often observed that "there will be occasions when the proffered [expert evidence] is so flawed" that it is "completely unhelpful to the trier of fact" and "its probative value is substantially outweighed by its prejudicial effect."[157] As one decision in the United States District Court for the Eastern District of Pennsylvania has explained, shortcomings in expert evidence render it excludable if "it is so flawed that it would be completely unhelpful or harmful to the trier of fact."[158]

Thus, courts considering the weight-admissibility distinction must determine whether the contested flaws are tertiary or central the evidence. In this case, those flaws go to the core body of the proffered evidence. It is not the case here that the contested deficiencies in the expert reports lend themselves to minor correction by

---

[156] <u>Id.</u>
[157] <u>Malletier v. Dooney & Bourke, Inc.</u>, 525 F. Supp. 2d 558, 563 (S.D.N.Y. 2007).
[158] <u>Merisant Co. v. McNeil Nutritionals, LLC</u>, 242 F.R.D. 315, 320 (E.D. Pa. 2007).

the factfinder on the basis of some credibility determination. In the instant matter, the Court views Defendant's very valid contentions not as critiquing some distant finding in Plaintiffs' expert reports, but as calling into question the very corpus of the reports themselves. Since the shortcomings evident in Plaintiffs' experts' methodology go directly to the core of the contested opinions, the evidence cannot be meaningfully amended by some ex post recalculation or restatement of the data. Therefore, because there are insufficient ways to sufficiently tailor the flaws in the contested reports and testimony and because admission would risk unduly prejudicing and confusing the jury, the instant dispute is more appropriately framed as a question of threshold admissibility.

Last, exclusion in this matter aligns well with a tested cornerstone of our judicial system, the ability of the adversarial posture to forge a practical, realistic outcome from two competing narratives. Admitting expert testimony of the type at issue here would undercut that fundamental trait altogether. The reason that federal courts permit each side to call qualifying expert witnesses is so that each side may be free to offer such opinions in appropriate cases, after the called-upon experts have carefully gathered facts and have conducted a diligent analysis. The adversarial nature of expert testimony in federal court—a face-off commonly referred to as a "battle of the experts"—requires at least that. Consequently, expert

analyses are not meant to be borrowed from one's adversaries, inputting minor adjustments or casting the data under a certain light only to suit one's own case. If Plaintiffs' experts believed that Defendant possessed sufficient expertise such that only minimal work on their part was needed, then in this Court's mind, allowing Plaintiffs no experts at all is a far superior solution than allowing Plaintiffs to borrow Defendant's own data and attempt to contort it into something that it is not.

**B.     The Contested Expert Reports And Testimony Employed Unreliable Valuation Methods By Using Inflated Sales Projections That Were Wholly At Odds With Observed Data As Inputs For The Model's Base Year.**

The second flaw that plagues Plaintiffs' expert reports is the reliance in the experts' models on inflated projections that deviated significantly from observed data as inputs for the model's base year. Essentially, all of the damages estimates that spring from Plaintiffs' experts' models are unrealistic and unhelpful to this Court because the experts relied on overstated data, even after having the opportunity to meaningfully revise their projections downward.

To blame the shortcomings in the contested reports on Plaintiffs' evidentiary spoliation alone is only to tell half of this case's story. In fact, the quite striking truth is that Plaintiffs experts eventually were provided with the missing data well in advance of the submission of their second report. No longer did Plaintiffs' experts need to copy numbers from outside sources and attempt to paste

them into their valuations. No further approximation was required, and no more time had to be spent scouring for the missing pieces or for substitute pieces that fit at least well enough. All of the inputs their valuations required were made available to Plaintiffs' experts, yet in an exceedingly questionable decision, they chose to disregard the actual numbers and proceed with the pro forma figures, which, by that time, amounted to nothing more than flawed ballpark guesstimates.

To begin, both experts knew and their reports so stated that Defendant's pro forma projection assumed a 3% year-to-year increase in net sales. Therefore, when they borrowed the pro forma projections as the basis for their own forecast, Plaintiffs' experts inherited that implied growth rate by default. Even assuming that a three percent growth rate is not wholly unreasonable, what is highly unreasonable is the pair's tethering of that rate to a wholly unrealistic base year.

Specifically, Plaintiffs' experts' model assumes that the 2007 fiscal year sales for Plaintiffs' Pittston store totaled $7,572,815, some $1.3 million higher than the actual data suggests. The actual sales number, which Ms. Bruno testified to in her affidavit, only totaled $6,211,555.49. Nevertheless, even after the experts were provided with the revised data—and after Mr. Dragotto signed a sworn affidavit stating that he had both reviewed those downward-revised sales numbers and confirmed that they totaled $6,211,555.49—Mr. Dragotto and Dr. Rajan still

proceeded to use the inflated pro forma projections in lieu of the actual data. This use of unrealistically inflated projections was compounded each subsequent year to which the model ran. For instance, the model assumes that sales for fiscal year 2008 were $7.8 million. In reality, assuming a 3% growth rate (a rate still largely at issue and perhaps overly generous), the actual 2008 number would have registered closer to $6.4 million, $1.4 million below the experts' prediction.[159]

One might analogize this overstatement to an illustration of two hypothetical investors, each of whom can invest at a given market rate that is identical for all market participants. Assume that at a given point in time, Investor A invests a $100.00 principal, and Investor B simultaneously invests a $50.00 principal. Given a constant rate of growth of 10% per year for both investors, then after one year, investor A will have an investment valued at $110.00 and for Investor B, one valued at $55.00. Both investments would have grown at the same rate, but Investor A's ultimate value will always be greater than Investor B's, solely as a result of our assuming that Investor A's initial investment was $50.00 greater than Investor B's. In the instant matter, the projections in Plaintiffs' expert report essentially assumed the role of Investor A, whereas the actual sales figures turned out to look a lot more like Investor B's principal in reality. The effective difference

---

[159]  $6,211,555.49 * 1.03 = $ 6,397,902.15.

in the resulting yield is significant and stems from the initial decision to use the

$7.5 million pro forma projections instead of the $6.2 million actual data as the

base value. Plaintiffs' proffered models are thus inherently flawed.

Assuming a 3% growth rate, Table 1 below indicates the sheer magnitude of

the difference between the sales as projected by Plaintiffs' experts who relied on

the pro forma projections to arrive at the 2007 base number and the sales that

would have resulted from using the actual 2007 data as the base:[160]



Table 1
Pro Forma-based  Projections versus Actual 2007-based Projections

---

[160]  The data for Table 1 appear in Appendix A at the conclusion of this Memorandum.

Moreover, throughout their depositions and this Court's <u>Daubert</u> hearing, Plaintiffs' experts suggested that their work should be accorded deference because they chose the "conservative" pro forma from which to extract their data. In the Court's view, that argument is both inadequate and contrary to the evidence. It seems apparent to this Court that a "conservative" projection in this case would have simply utilized the observed data, especially after it turned out to be significantly lower than the pro forma projections. There is nothing "conservative" about using inflated, unrealistic figures in one's valuation models. Relatedly, and as discussed above in Part III.A, Plaintiffs' contend that there was no "self-serving" element in their experts' decision to use the Defendant's own projections. Quite the opposite, the evidence suggests that Plaintiffs' experts actually chose certain of the highest data points that were available to them, regardless of their disjunction with reality.

These problems are compounded by the fact that Plaintiffs' experts were unfamiliar with the purpose of and process used to generate the pro forma. Defendant has consistently offered valid business explanations other than long-term profit projections for its compiling of the pro forma, particularly as it relates to the pro forma's use as a break-even analysis tool in lending or supply decisions. Such a purpose might even be gleaned, this Court thinks, from the term "pro

forma" itself—a Latin phrase meaning "as a matter of form"—here, a mere deal-making formality intended to provide a surface-level financial snapshot and  not an in-depth exploration of a company's operations, financial indicators, and long-term profitability. In addition, the evidence rather starkly suggests that Defendant itself no longer relied at all on the pro forma at issue here, that it had made subsequent downward revisions of those projections, and that those revisions were even potentially discussed with Plaintiffs.

The shortcomings discussed in this Part could easily be classified as a failure to satisfy either Federal Rule of Evidence 703's reasonable reliance component or Paoli II's interpretation of Federal Rule of Evidence 702 that requires an expert's model to "fit" the disputed issue. As Paoli II made clear, the standard under Rule 703 "is equivalent to Rule 702's reliability requirement—there must be good grounds on which to find the data reliable."[161] As Judge Edward R. Becker, writing for the Paoli II court, concisely explained:

> It makes sense that the standards are the same, because there will often be times when both Rule 702 and Rule 703 apply. For example, expert testimony that uses animal studies must, to be admissible for the purpose of drawing conclusions about humans, meet Rule 702's requirement of "fit." This requires the court to assess whether there are good grounds for concluding that the animal studies demonstrate causation in humans. But for an expert to rely on animal studies (if their admissibility in evidence is not independently established), these

---

[161] Paoli II, 35 F.3d at 748.

studies must also meet the requirements of Rule 703—the conclusions of these studies must be data which must be of a type reasonably relied upon by experts to analyze causation in humans. If the expert's reliance on animal studies to draw conclusions about people constitutes a methodological flaw, it is a methodological "flaw" consisting of relying on data not of a type reasonably relied upon by experts.[162]

Further, Paoli II makes clear "that it is the judge who makes the determination of reasonable reliance."[163] Here, reasonableness as it relates to the use of the underlying projections by Plaintiffs' experts was not established, and so for this second and independent reason, the contested reports and testimony are properly excluded.

### C. The Contested Expert Reports And Testimony Fail To Satisfy The Supreme Court's Daubert Factors And The Third Circuit's Paoli II Factors.

Though not explicitly acknowledged, the enumerated Daubert and Paoli II factors necessarily underlie the preceding analysis. The Court now sets out a brief analysis of those factors in full for the sake of completeness.[164]

The two most important factors in this case are whether the method is generally accepted and the relationship of the employed technique to methods that have been established to be reliable. The outcome of these two factors depends

---

[162] Id.

[163] Id.

[164] The Court notes that factors dealing with the experts' qualifications are not at issue here, except for the fact that neither expert has experience modeling the grocery industry.

largely upon the frame through which one views the method employed here. Broadly, as Plaintiffs' and their experts would have it, discounted cash flow models and present value calculations in the business setting are commonplace. Although the Court agrees with that contention, the troubling reality is that time-money valuations based on unreliable, unverified data are not reliable. When properly performed, present value calculations are generally reliable; neither party doubts that. However, inputting inflated projections into a discounted cash flow model in an attempt to arrive at a contract damages figure warps the true purpose of such models, especially when contradictory data exists. It is, as Mr. Manochi described, the "garbage in, garbage out" problem. In other words, it is this Court's view that the methodology of Plaintiffs' experts in this case has strayed sufficiently far from commonplace present value calculations so as to be deemed unreliable.

Certain of the factors were simply not established by Plaintiffs either in their briefing or during the Court's Daubert hearing. These factors include the frequency of peer review, the known or potential rate of error, and the non-judicial uses to which the methods have been put. Again, the Court must be careful to select the appropriate scope through which to construe these factors. Of course, present value calculations and discounted cash flow models have been subjected to peer review, have been put to non-judicial uses, and have a relatively low rate of error when

properly performed. However, the Court does not believe that this is the frame it should be using here. Rather, the Court must consider the extent to which the type of lost profit valuation performed in this case is sufficiently established. That is to say, the Court must consider the extent to which Plaintiffs' expert reports, given their deviations from standard practice, are adequately proven. Because of the absence of any independent verification and the use of inflated projections that deviated significantly from reality, the Court finds that the contested analyses were not conducted in a manner that a reasonable expert would employ. Because several of these factors have not been met, exclusion is further warranted.

Such a result is also apparent after considering those factors dealing with testability and the maintenance of controlling standards governing the questioned methodology. Although present value calculations are testable and follow a prescribed formula, the deviations undertaken here by Plaintiffs' experts here were sufficiently distinct from that observed in a standard contracts damages model in federal court. In addition, Plaintiffs, the party on whom the burden of admissibility is placed, have failed to adduce sufficient precedent indicating otherwise.

* * *

The preceding analysis does not mean to suggest that experts should never be permitted to rely upon secondary data. Of course, certain types of computations

49

require such reliance. However, federal courts that have opined on this particular evidentiary issue have made certain important points about complete reliance on secondary sources. First, the expert must conduct some sort of independent investigation or verification to ensure that the data he or she plans to use is both accurate and helpful to the court in light of the disputed issues. Second, that investigation should be sufficiently thorough such that the expert has gained a working familiarity with the borrowed data so that the expert can demonstrate the data's reliability. Blind adherence to data of unknown origin does not suffice in federal court. Therefore, in the context of commercial projections, the expert's investigation should reveal certain objective characteristics of trustworthiness, such as reliance on a market study, examination of relevant industry comparisons, and consistency with observed data, to enumerate a few examples.

## IV.   Conclusion

An expert owes certain nondelegable duties to the court and the parties. They function, after all, as indispensable guides toward justice and proper resolution in matters whose facts would benefit from examination through a scientific, mathematical, or financial lens. As Federal Rule of Evidence 702 provides, the touchstone of expert admissibility is helpfulness to the trier of fact. The role of an expert witness in federal court is thus necessarily an active one—it

requires, at a minimum, an appropriate mix of careful fact-gathering and constructive analysis, two hallmarks in any expert methodology assuring that the proffered opinions stand on good footing and proceed with a tested analysis.

In fact, courts say that experts have great responsibility precisely because they enjoy great influence. Their influence has a particular potency over those individuals who may someday line this Court's jury box in an effort to bring this dispute to a complete resolution, an influence often stemming from the expert's background, resume, degrees, or title. As Judge Diane P. Wood, writing for the Seventh Circuit has explained, "[u]nless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury."[165]

If Plaintiffs' experts here were content to take a back seat to Defendant's superior familiarity with the industry, those experts could have always turned down the offer to testify. The same is true if those experts were dissatisfied with the data that Plaintiffs or their counsel had provided them. However, signing one's name to an expert report in federal court carries significant meaning and promises a certain analytical approach, one that the Court believes has unfortunately not been met here. As a result, Defendant's <u>Daubert</u> Motion to exclude Plaintiffs'

---

[165]  <u>United States v. Hall</u>, 93 F.3d 1337, 1343 (7th Cir. 1996).

expert reports and testimony is granted in full.

An appropriate Order follows.

BY THE COURT:


/s Matthew W. Brann
Matthew W. Brann
United States District Judge

# APPENDIX A

## TABLE 1 DATA

| | **Pro Forma** | **Actual 2007** |
|---|---|---|
| **2007** | 7.5728 | 6.2116 |
| **2008** | 7.8000 | 6.3979 |
| **2009** | 8.0340 | 6.5898 |
| **2010** | 8.2750 | 6.7875 |
| **2011** | 8.5233 | 6.9912 |
| **2012** | 8.7790 | 7.2009 |
| **2013** | 9.0423 | 7.4169 |